# Ehret *v.* Schuylkill River East Side R. R. Co., Appellant.

*Eminent domain—Railroads—Leasehold—Contract—Damages.*

Where in a proceeding to recover damages for leasehold premises appropriated by a railroad company under the right of eminent domain, it appears that plaintiffs were under a contract to remove daily from a city gas works a large quantity of tar, and that the premises in question, which they leased from the city, enabled them to receive the tar without cost and to manufacture it without transporting it to and from distant points, it is proper to admit evidence that, after the land was taken, it became necessary to carry the tar to a place of distillation by a boat specially construct-

ed; that it was necessary to erect temporary works for the distillation of the tar when received; and that it was necessary to haul over inaccessible roads the barrels needed to hold the tar and its products.

*Condemnation proceedings—Parties—Practice.*

In condemnation proceedings, objection that parties are improperly joined as plaintiffs should be made when the petition for the appointment for viewers is presented, or, at the very latest, when the issue is framed by the court.

It is no objection to the regularity of condemnation proceedings that the owner of the leasehold condemned, has joined his partners with him as parties plaintiff.

Argued April 6, 1892.   Appeal, No. 266, Jan. T., 1892, by defendant, from judgment of C. P. No. 1, Phila. Co., Sept. T., 1886, No. 747, on verdict for plaintiffs, M. Ehret, Jr., & Co. Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM and HEYDRICK, JJ.

Issue directed on appeal from award of viewers assessing damages for taking tar works by defendant.

The facts appear by the opinion of the Supreme Court.

At the trial, before BREGY, J., one of the plaintiffs, M. Ehret, Jr., was asked: " Q. What did it cost you in order to enable you to complete your contract, in addition to what it would have cost you if they had taken your property ? "   Objected to.

Mr. Johnson: I offer to prove that under the contract we entered into with the city, the city supplied us with the works with which to fulfill our contract, and that our ground was taken away from us; that by reason thereof we were put to additional cost in order to perform our contract—to a cost of $37,000.

Objections renewed, objection overruled and exception.

The witness answered: " We were compelled to buy a boat in order to remove the tar.   Q. Was that an ordinary boat, or one especially adapted for the purpose, or how was it adapted ? A. We had to get the Market street tar away, and as most of it was made in the winter time, when the Schuylkill river is sometimes frozen over, we had to get a boat to get through the ice in winter time.   We even went so far as to get an estimate to buy an iron boat."

Mr. Addicks: I suppose that that testimony has already been

included in their offer, because it has been a very broad one. However, I want to object to all this evidence as to the estimated cost or the actual cost of the boat. I object to all evidence as to the cost of the boat.

The witness: I will say that that boat was built to take that tar away, for no other purpose at that time, and that we would not have built the boat if they had not taken away our works.

By Mr. Johnson: " Q. Did you try to solve this problem as to how to take this tar away, to the best of your ability? A. Yes, sir. We studied the matter for a month or two, and we wanted to get the most economical way to do it. We came to the conclusion that this would be the cheapest way. Q. Did you try to get near works in which to do it? Were there any other works in which you could do it? A. No, sir. Q. Where did you finally do it? A. We finally took it away to our works at Point Breeze. Q. In order to do the work there, you had to get the tar down there? A. Yes, sir. Q. What was the only way you had to get it down there? A. By this boat. Q. Why was it necessary to get the tar down by boat? A. We had to take it away in order to distil it and dispose of it. Q. Why could it not be gotten there by rail or in carts? A. Well, we figured on hauling it down there and found that it would cost from $25,000 to $30,000, and we had found out that we could not take it in tank-cars, and this was the last resort. Q. Then you built that boat for that? A. Yes, sir. Q. What else did you have to do in order to carry out your contract? A. We had to increase our plant at our works at Point Breeze. Q. In what way was additional expense thrown upon you in performing this contract by reason of your having the ground taken away from you? A. We had that expense for the boat, and we had to go to the expense of increasing our plant at Point Breeze to work that much tar. Then we had to pay additional for hauling and for barrels and for delivery to the market. Q. What do you mean by saying that you had to pay that much additional for hauling? A. When we worked our coal tar up into the various products, when we were right at Market street, we would only have to haul to the various warehouses, but when we were manufacturing it at Point Breeze we were put to additional expense in hauling it from Point Breeze. Q. Did you estimate in barrels the product you

took away? What I want to know is this: What quantity of tar during the twenty-one months you dealt with? A. I have vouchers here for the amount of tar at Market street, 2,789,373 gallons. That is the amount of tar we received and paid for during the twenty-one months, the balance of our contract. Then there was tar from Camden and from the Northern Liberties gas works, which we had contracted to haul, with the tar from the Market street works. After they took the works down there we were compelled to haul it to Point Breeze. I have the vouchers here from those two gas companies, the number of gallons that we took away during the twenty-one months. Q. Did you have to pay an additional cost for unloading the tar-boat? A. Yes, sir; it cost us $300 for a pipe line to fit up to unload that boat. Q. What was the aggregate amount of the additional cost you were put to in receiving and disposing of the tar during those twenty-one months? A. $37,776.39." [1]

The same witness was asked, under objection and exception: "Q. What was the aggregate amount of the additional cost you were put to in receiving and disposing of the tar during those twenty-one months? A. $37,776.39." [2]

On cross-examination the same witness was asked: "Q. Didn't you buy the city tar after the Ninth Ward works had been removed?"

Mr. Johnson: I object to that question, on the ground that it is both irrelevant and not in cross-examination.

Mr. Addicks: But if I can show that these gentlemen decided on a trial of their business without the Ninth Ward works that they could bid a higher price for the coal tar it will throw some light upon the value of the Ninth Ward works, I think.

Mr. Johnson: No; because, in the first place, the market was different, and, in the second place, if it would have been profitable to do it at a higher price then they would have made more money. That is not the question, because if the contract was more valuable then they could have made that much more money.

Objection sustained and exception. [3]

Lawrence McDonald, a witness for plaintiff, testified: "Q. Do you know the road to Point Breeze from Market street? A. Yes, sir. Q. You have traveled it many times? A. Yes,

sir.  Q. And you found the road to Point Breeze a hard road to travel?  A. Well, it was at one time, but it is not now. Q.  It was not good in 1886, 1887 and 1888?  A. No, sir. Q. Tell the. jury what its condition was then for hauling purposes ? "

Objected to.  Objection overruled and exception. [4]

" Q.  Now, tell us what its condition was?  A. Well, when we started to send a team to Point Breeze we never calculated the time the team was to make in coming back.  It might be a day, or it might be all day, and, in fact, the team might not come back until next day.  I will say that several times we have sent teams the next day to help them out."

Thomas F. Kelley and J. L. Hellings testified under objection and exception, that empty barrels were from three to five cents dearer when delivered at Point Breeze than when delivered at Market street, the old works of the plaintiffs. [5, 6]

Defendant offered to prove that at the expiration of the lease now in question, the manufacture of coal tar was put up for public bidding, without the Ninth Ward tar works, and that Steelwaggen & Co. bid thirty cents per ton for coal carbonized; and that upon the refusal of the mayor to award the contract to them, there was a re-advertisement and the contract was awarded to Michael Ehret, Jr., & Co., at twenty-one and a half cents per ton of coal carbonized, for three years; and that again in 1891 upon the public letting of said contract without the Ninth Ward tar works, the contract was awarded to Michael Ehret, Jr., & Co., at thirty-five cents per ton of coal carbonized. Objected to.  Objection overruled and exception. [7]

Defendant presented these points:

" 1. This proceeding was commenced by a petition of M. Ehret, Jr., George W. Elkins, and George D. Widener, trading as M. Ehret, Jr., & Co.  They rest their claim for damages upon a lease produced in evidence from the city of Philadelphia to Michael Ehret, Jr., known as No. 2, attached to the contract between the same parties for five years from July 1, 1883, for $500 per year for the ground covered by. the tar works building at the Ninth Ward gas works in Philadelphia. The lease provides that M. Ehret, Jr., ' shall not at any time during the said term let or demise, or in any manner dispose of the said hereby demised premises or any part thereof, for

all or any part of the term hereby granted, to any person or persons whatever, nor occupy or use the building thereon or to be erected on said ground by the said Michael Ehret, Jr., in any other manner than for the distillation of the tar made at the Ninth Ward gas works, without the consent and approbation in writing of the said trustees is had for that purpose.' No assignment of the said lease to M. Ehret, Jr., & Co., composed of M. Ehret, Jr., George W. Elkins, and George D. Widener, has been produced or proved at this trial; nor has the consent and approbation in writing of the trustees of the Philadelphia Gas Works been produced and proved.   Under this state of affairs the verdict must be for the defendant." Refused. [8]

"2. If the jury find that M. Ehret, Jr., after bidding for the tar contract of the Philadelphia gas works, awarded by the trustees of the same, entered into said contract, and as a part thereof obtained a lease of the premises in question in this suit, containing a clause that the said M. Ehret, Jr., 'shall not, at any time during the said term let or demise or in any manner dispose of the said hereby demised premises or any part thereof, for all or any part of the term hereby granted, to any person or persons whatever, nor occupy or use the building thereon, (or to be erected on said ground by the said Michael Ehret, Jr.,) or in any manner other than for the distillation of the tar made at the Ninth Ward gas works, without the consent and approbation in writing of the said trustees is had for that purpose,' then the verdict in this suit by Michael Ehret, Jr., George W. Elkins, and George D. Widener, trading as M. Ehret, Jr., & Co., must be in favor of the defendant, in the absence of any proof of the consent in writing of the said trustees to the assignment or disposal of said lease and contracts to the plaintiffs in this suit."   Refused. [9]

Verdict for plaintiff for $41,973.36, and judgment thereon. Defendant appealed.

*Errors assigned* were (1–7) rulings on evidence, quoting bills of exception and evidence; (8, 9) refusal of points, quoting them.

*W. H. Addicks,* for appellant.—While a tenant has a right to recover the market value of his leasehold, he cannot recover,

as items of damage, the intangible and speculative items going to make up alleged business losses or extra expenses: Getz v. R. R., 105 Pa. 547, 113 Pa. 214; Eby v. R. R., 107 Pa. 166; Chambers v. South Chester Borough, 140 Pa. 510; Kersey v. R. R., 133 Pa. 234; R. R. Co. v. Patterson, 107 Pa. 461; Finn v. Gas Co., 99 Pa. 631; Pa. R. R. v. Marchant, 119 Pa. 557–558; R. R. v. Robinson, 95 Pa. 426.

*John G. Johnson,* for appellees.—The evidence was properly admitted to demonstrate the value of the leasehold which the plaintiffs lost: R. R. v. Vance, 115 Pa. 327; P. & R. R. R. v. Getz, 113 Pa. 214; Kersey v. R. R., 133 Pa. 234.

OPINION BY MR. JUSTICE STERRETT, October 3, 1892.

In September, 1886, the plaintiffs were in possession of a lot at southeast corner of Filbert street and Schuylkill river—part of the city gas works property—fronting about one hundred and fifty feet on said river and extending back about sixty feet, on which valuable machinery was erected for the purpose of distilling crude tar made by the gas works. They were then engaged in the prosecution of that business.

The railroad company defendant, having previously located its road on the lot, entered thereon by virtue of its right of eminent domain, and, as alleged by plaintiffs, took down all the machinery, removed some of it to points on the river bank in the southern section of the city, and some of it to Wilmington, Delaware; and, in consequence of removal and exposure to the weather, etc., said machinery became so worthless that it was afterwards disposed of by defendant company at very little more than the price of old iron.

Part of the machinery referred to was purchased from Warren, Lober & Co. in April, 1883, for $17,523. Other machinery was afterwards purchased by plaintiffs for the purpose of improving and enlarging the capacity of the plant.

Shortly before that, Michael Ehret, Jr., one of the plaintiffs, contracted with the city to purchase all the tar made at its Ninth Ward gas works, during the period of five years commencing July 1, 1883. He bound himself, his executors, administrators and assigns to furnish suitable receptacles for all the tar that would be produced daily, during said period, and thus prevent any overflow of the wells in said works, to

remove said tar without delay in order to avoid interference with their operation, and to pay for said tar a certain price per gross ton of coal carbonized in the process of making gas at said works.

It was claimed that a vital part of Ehret's contract with the city was that he should have the use of the adjoining premises in the way specified.   The tar, as produced, was to be run from the gas works into plaintiffs' tanks and other reservoirs so that they would incur no expense in its removal.   The central situation of the Schuylkill wharf front enabled them to secure a full supply of barrels, without expense of hauling, and also enabled them to conveniently supply their customers with the products of their refinery.   These and other facilities for handling materials as well as the manufactured products, etc., were of great advantage.

In their petition, filed November, 1886, for the appointment of viewers to assess their damages, plaintiffs averred their ownership of said machinery, and of the leasehold of the premises on which the same had been erected and used in their business.   In December, 1889, the viewers awarded $43,153.53 damages in favor of plaintiffs, and both parties appealed.   The court ordered that the cause should be put at issue for trial, etc., " to determine what legal damage, if any, the plaintiffs may have sustained in consequence of the location of defendant's railroad and the consequent taking and occupying by the defendant of the strip of ground . . . . described in the report of the viewers, and the construction of a railroad thereon, subject to the ruling of the court . . . . , as to the date when the right of action accrued to plaintiffs, with the right of appeal by either party to the Supreme Court."

This was the issue on which the case was tried.   It does not appear that any question of title in plaintiffs to the lease, machinery, etc., or want of proper parties to the proceeding arose until a motion for nonsuit was made.

The cause was carefully and ably tried, and in a clear and comprehensive charge, calling attention of the jury to the facts and circumstances presented by the evidence and questions of law applicable thereto, etc., it was fairly submitted to the jury.   Several points for charge were presented by defendant company, all of which, except the two recited in the 8th

and 9th specifications of error, were withdrawn. These two points, after referring to the fact that the lease of the lot was to Michael Ehret, Jr., alone, that it contains a clause against subletting without consent of the lessor, etc., and averring that no consent to subletting or transfer to the other plaintiffs has been shown, etc., request the court to charge that the verdict must be for defendant. Both of these points were rightly refused. The covenant against subletting or assigning was for the benefit of the city. In the absence of any evidence that the city authorities objected to its lessee associating others with himself in the business contemplated by the lease, the defendant company has no just reason to object. It cannot be prejudiced by having two others joined with the lessor as plaintiffs. Moreover, the bald technical objection, grounded on alleged want of proper parties, came too late. It should have been raised, if at all, in limine, when the petition for appointment of viewers was presented, or, at the very latest, when the issue was framed by the court. The 8th and 9th specifications are dismissed.

Several of the remaining specifications relate to the admission of testimony tending to show the additional cost entailed upon plaintiffs in receiving and handling the tar and other materials, etc., offered for the purpose of showing the value of plaintiffs' lease of the lot appropriated by defendant, etc.

An examination of these specifications has failed to convince us that there was any error in admitting the evidence complained of. The circumstances of the case were somewhat peculiar—quite out of the ordinary course. We have already referred to the contract to take all the tar made by the gas works, etc. The location of the leased lot adjoining the works from which plaintiffs were bound to receive their supply of tar, at least to the extent of the production of those works, afforded facilities for economically handling supplies and disposing of products, that could not be had elsewhere. They were bound by Mr. Ehret's contract with the city to take and pay for all the tar made at those works. These and other matters that might be mentioned were elements which evidently and properly entered into the consideration and determination of the value of the lease. It was part of the property taken by defendant company as locum tenens of the common-

wealth, property for which defendant was bound to make just compensation to plaintiffs from whom it was taken.   It is a mistake to say that the introduction of the testimony referred to was a covert attempt to recover profits.   It was nothing of the kind. They sought to show that the lease was worth what they claimed, because it saved to them certain expenses in performing a contract which had been entered into because of the advantages that were afforded.   Among other things, it was shown that, in consequence of the leased lot having been taken, it was necessary to convey the tar to the place where it was distilled by a specially constructed boat; that it was also necessary to erect temporary works for distilling the same, etc.   On principle as well as authority we think such evidence was not improper.   In Railway Co. v. Vance, 115 Pa. 327, testimony was received to prove loss of custom at a mill, not with the view of recovering the amount as damages but for the purpose of showing the extent to which the value of the mill property had been diminished.

Railroad Co. v. Getz, 113 Pa. 214, recognizes the right of owners of a leasehold to recover, as damages, the cost of removing their machinery.

In Kersey v. Railroad Co., 133 Pa. 234, plaintiff was lessee of a coal wharf, etc., on which machinery for handling coal was erected.   The defendant constructed its railroad across the property, dividing it into two parts and so interfering with plaintiff's sheds, runs and other appliances, that it became necessary for him to construct new ones, involving also the erection of a high single span bridge, etc.   The operation of these new appliances involved considerable breakage of and increased cost of handling the coal.   For the purpose of showing the value of his leasehold as it was before part of it was taken by the railroad company, the plaintiff was permitted to prove the cost of the substituted appliances, the extent of waste necessarily resulting from their operation and the increased costs of such operation.   In that case our Brother McCOLLUM speaking for this Court said: " It is well settled that the proper measure of damages is the depreciation in the market value of the property caused by the location and construction of the railroad.   But the elements to be considered in the ascertainment of this depreciation are as varied as the properties affected

and the uses to which they are applied.   A specification of all these elements is impossible, because they cannot be anticipated, and many of them remain to be developed in the course of the litigation consequent upon the taking of property by eminent domain.   In the ordinary appropriation of land for railroad purposes, the opinions of witnesses who are conversant with the property, and the general selling price of land in the vicinity, are received on the question of its value unaffected by the road and its value as affected by it.   But this is not exclusive of other and in some cases better methods of proof.   It may be stated as a general principle, applicable to cases of this sort, that whatever injuriously affects the property, as the direct and necessary result of the location of the road upon it, may be considered in the assessment of damages."

These well considered and clearly expressed views apply forcibly to several features of the case before us, and serve to enforce the position that the evidence complained of was not only competent but perhaps the best that some features of the case were susceptible of.

Without referring more specifically to the 1st, 2d, 4th, 5th and 6th specifications we think neither of them can be sustained.

There was no error in sustaining plaintiffs' objections to the offers recited in the 3rd, and 7th specifications.

An examination of the record with reference to each of the specifications, respectively, has led us to the conclusion that there is nothing in either of them that requires a reversal of the judgment.

Judgment affirmed.