In Re: Condemnation by the Commonwealth of Pennsylvania, Department of Transportation of Right of Way for Legislative Route 23047 etc. Commonwealth of Pennsylvania, Department of Transportation, Appellant.

Argued December 15, 1982, before Judges BLATT, WILLIAMS, JR. and DOYLE, sitting as a panel of three.

*John T. Clary, Jr.*, Assistant Counsel, with him *Ward T. Williams*, Chief Counsel, and *Jay C. Waldman*, General Counsel, for appellant.

*Andrew J. Forbes, Cramp, D'Iorio, McConchie & Forbes, P.C.*, for appellee.

OPINION BY JUDGE WILLIAMS, JR., January 12, 1984:

The Pennsylvania Department of Transportation (DOT) has appealed from a judgment entered by the Court of Common Pleas of Delaware County following a jury verdict in an eminent domain case. The appellant, DOT, argues that the trial court erred in denying its motion for a new trial.

On October 2, 1968, the Pennsylvania Department of Highways, predecessor to DOT, filed a Declaration of Taking to condemn a highway easement in a certain

strip of land located in the middle of Darby Road, Haverford Township, Delaware County. The condemned land is about 1.54 miles long,[1] and has a width that varies between 30 feet and 80 feet. Until about 1967, the strip was occupied by tracks for a trolley service that was owned and operated by the Philadelphia Suburban Transportation Company (Company).

The Declaration of Taking recited that the condemnees were those set forth on an attached schedule. The only condemnee *named* on that list was the Company. According to the condemnor's list of condemnees, the Company was the "fee owner" of part of the condemned strip; as to the rest of that strip, the Company was listed as having easements, "fee owners unknown."

On April 23, 1970, the Company filed a petition, pursuant to Section 502 of the Eminent Domain Code (Code),[2] for the appointment of viewers to ascertain just compensation. The petition alleged, *inter alia*, that the condemned land consisted of 7.529 acres, and that the Company owned 4.336 of the acres "in fee." The petition also alleged that, as to the remaining part of the condemned property, the Company had easements or "conditional fee title." And, according to the petition, the property taken was an integral part of the Company's transit system.

On April 23, 1970, the trial court entered an order appointing a board of viewers. By that time DOT had become the successor agency to the Department of Highways. The condemnor did not, at any time, file preliminary objections to the petition for viewers.

Viewers' proceedings were conducted in October of 1977 and February of 1978. As a result of those

---

[1] The actual length of the condemned strip appears to be 1.538 miles.

[2] Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. §1-502.

proceedings, the viewers awarded $500,000 as "general damages." On November 9, 1979, the viewers issued their report, which contained five short paragraphs. The report did not state for what property the award was made. As to who was entitled to receive the damages, the report simply declared that the award was *"to the owners,"* subject to any liens or encumbrances of record, *"or any other interest that may appear."* (Emphasis added.) DOT took a timely appeal to the trial court; but, in doing so, did not set forth any specific objections to the report. On its appeal form, DOT described the involved property and the condemnee's interest therein as follows: "7.529 acres of which 4.336 were owned in fee simple, with remaining 3.163 [sic] acres held by way of easement, along a total linear distance of 1,538 [sic] miles with a width from minimum 30 feet to maximum 80 feet." DOT demanded a jury trial.

On February 12, 1980, DOT petitioned the trial court to preliminarily determine what title or other legal interests the Company had, at the time of condemnation, in the land that was condemned. The petition averred that such a determination in advance of trial was essential to a proper assessment of damages. The Company filed an answer which opposed the petition on various grounds. The trial court, by an order dated May 29, 1980, dismissed DOT's petition.

On January 26, 1981, the matter came on for trial. By that time, the Bryn Mawr Corporation (BMC) had succeeded to the interests of the Philadelphia Suburban Transportation Company. Just prior to the commencement of the trial, DOT made an offer of proof which, according to DOT, would show that the condemnee had lost its easements in the condemned land before the Declaration of Taking was filed.

According to its offer of proof, DOT proposed first to show, by certain deeds, that the condemnee's

easements in the condemned land had been originally acquired for rail-traction purposes. DOT also proposed to show that the trolley service over that land had been abandoned in 1967. Regarding the latter point, DOT wished to introduce certain orders of the state Public Utility Commission, issued in 1966 and 1967, showing that the trolley service along the subject corridor and other routes had been officially decleared abandoned; and showing that the condemnee had been directed to remove the tracks. DOT further proposed to prove that, although the condemnee had replaced the trolleys with bus service along the land-corridor here in question, less than 50% of the condemned property itself continued to be used by the condemnee for its transit business. DOT argued, moreover, that the operation of the bus service would not have legally preserved the easements the condemnee had in part of the land condemned.

BMC opposed the offer of proof, by disputing DOT's contention that the easements had been abandoned or otherwise lost; and by asserting *that it was too late in the case for DOT to raise such a contention.* In fact, BMC had filed a written motion *in limine* to have the trial court bar DOT from introducing any evidence regarding the alleged abandonment of easements, or regarding alleged reverter interests of third parties. The court agreed with BMC's argument that DOT was untimely in seeking to challenge the condemnee's ownership of easements in the condemned land; accordingly, the court granted the motion to exclude any evidence having such a purpose.

At trial, BMC called two witnesses, both of whom were offered as valuation experts. The first, John F. Curtin, testified that he was a registered engineer; and that he had been, for the past 35 years, a partner in a transportation engineering firm located in Philadelphia. According to Mr. Curtin, he had been re-

tained more than a thousand times, by numerous transportation companies and public agencies, to make studies, analyses and evaluations of transit systems. He added that he had even performed services for DOT and its predecessor, the Department of Highways.

Curtin further testified that, in analyzing various transportation systems, he was frequently called upon to appraise transportation corridors and other transportation properties. Regarding transportation corridors, or segments of transportation systems, he stated that his appraisal tasks included determining what a particular corridor would cost in terms of construction and real estate acquisition, or determining what a corridor would be worth in the event of liquidation or some alternative course of action. According to Mr. Curtin, he had most recently performed such appraisal work for the United States Railway Association, in connection with several railroads that were to be taken over by Conrail. This witness also testified that his business experience included managing a railroad and a bus line.

DOT conceded that Curtin was a qualified engineer, but objected to his qualifications as a real-estate valuation witness. The trial court, pointing out that the property in issue was a transportation corridor, overruled DOT's objection.

Curtin described the approximately 1.54 miles of condemned land as being a segment of the Company's former 5-mile trolley route that extended from 69th Street Terminal in Upper Darby, Delaware County, to Ardmore in Montgomery County. The trolley tracks, after starting at 69th Street Terminal, proceeded west about 2 miles along the middle of West Chester Pike to Llanerch; from that point the tracks turned northwesterly to extend along the center of Darby Road, for over a mile, to Eagle Road; and then turned northeast-

erly to proceed to the end of the line at Ardmore.[3]
The land condemned consists of the section of track
roadbed that extends along Darby Road to Eagle
Road.

Mr. Curtin also testified that, by the time of the
condemnation in October 1968, Philadelphia Suburban
Transportation Company had substituted busses for
trolleys on the route between 69th Street Terminal
and Ardmore, and had removed all the trolley tracks
on that line. According to Curtin's testimony, the
busses used public streets next to the track roadbed,
except for a section of the route that comprised the
second half of the distance between Llanerch and Ard-
more. In that section, the Company had paved the
track roadbed to provide a way that was exclusively
for its busses. Curtin further stated that, at the time
of the condemnation, the Company had intended to
pave the entire trolley roadbed to provide a high-
speed busway between 69th Street Terminal and Ard-
more.

Given the location and dimensions of the land con-
demned, and given his assessment of the area's trans-
portation needs, Curtin concluded that the highest and
best use of the condemned land was as a transporta-
tion corridor. Based on his study of ten other trans-
portation corridors, Curtin opined that the condemned
property, at the time of its condemnation, had a fair
market value that ranged from a conservative
$502,000 to an average figure of $810,000. According
to Curtin, his valuation was derived from a statistical
formula that correlated the cost "per lane-mile" of a
comparable transportation corridor and the popula-
tion density of the area in question.

BMC's other valuation witness was John P. Dol-
man. Mr. Dolman testified that he was a realtor and

[3] The roadbed along the entire route accommodated 2 sets of
tracks.

appraiser, and that he had been associated with the Jackson-Cross Company of Philadelphia since 1937. Dolman further stated that in 1968 he had been engaged by the Philadelphia Suburban Transportation Company to appraise the segment of land that was condemned by the Department of Highways. According to this witness, the *entire* trolley route from 69th Street Terminal to Ardmore had a pre-condemnation value of $1,070,000; and that, after the condemnation, the remaining segments of the trolley route were worth $570,000. Thus, in the opinion of Dolman, the damages sustained amounted to $500,000. Mr. Dolman indicated that his valuation was based on his comparing many other transportation corridors. He further explained that the total route between 69th Street Terminal and Ardmore was worth $207,525 per mile *as an unbroken transportation corridor;* but that after the condemnation removed a segment of the route, the remaining portions were worth $157,545 per mile.

During its cross-examination of Mr. Dolman, DOT sought to inquire as to the nature of the interest owned by the Philadelphia Suburban Transportation Company in those segments of track roadbed, on the 69th Street Terminal-Ardmore line, that were *outside the condemned section.* The trial court sustained an objection by BMC, and ruled that no such inquiry or evidence would be permitted, because of the court's pre-trial order relating to the issue of ownership.

The only other trial evidence adduced by BMC, was its reading into the record that part of the Declaration of Taking which described the pre-condemnation interest of the Philadelphia Suburban Transportation Company *in the land taken.* As noted, the Declaration of Taking recited that the Company owned part of the condemned strip in fee, and that it owned easements in the rest.

. .DOT presented one valuation witness, Richard DeGrouchy. According to Mr. DeGrouchy, he had been a real estate broker and appraiser for at least 25 years. His opinion was that the property taken had a value of $773,400 before condemnation; and that it was worth $542,700 after the condemnation. In short, DeGrouchy took the position that BMC's predecessor had suffered condemnation damages in the amount of $230,700.

On January 28, 1981, the jury returned a verdict in favor of BMC in the sum of $505,000. DOT filed a motion for a new trial. After hearing argument from the parties, the trial court denied the motion. On February 25, 1981, the court issued an order directing that judgment be entered on the verdict. However, for some reason not readily ascertainable from the face of the record, the trial court had molded the verdict to $792,791. Consequently, judgment was entered for the latter sum. DOT's appeal to our Court followed.

DOT presents several arguments as to why the court below should have granted its motion for a new trial. One of the main targets of this appeal is the trial court's *in limine* order barring DOT from introducing evidence, at trial, to dispute the condemnee's ownership of easements in part of the land condemned. DOT had proposed to put in evidence two 1902 deeds by which an early corporate predecessor of the Philadelphia Suburban Transportation Company had been granted "the right to occupy" certain strips of ground, which appear to be part of the land condemned in October 1968.[4] Each of those deeds recited, *inter alia,* that "the right to occupy" was "for *railway purposes.*" (Emphasis added.) Based on the terms of those deeds, DOT proposed to show that the

---

[4] These 1902 conveyances were to the "Ardmore and Llanerch Street Railway Company, its successors and assigns."

Philadelphia Suburban Transportation Company had lost those easements prior to the 1968 condemnation. More specifically, it was DOT's contention that when the Company terminated the trolley service, the easements ceased to be used "for railway purposes" and, thus, expired pursuant to the terms of the deeds that created them. DOT argues that the trial court's order precluding evidence to support the foregoing contention was serious error.

The appellant next focuses on the fact that BMC, through the trial testimony of John Dolman, was allowed to present evidence of severance damages as to segments of the 69th Street Terminal-Ardmore track roadbed that are *outside of the section actually condemned*. In that regard, DOT complains that BMC adduced no evidence as to what ownership interest the Philadelphia Suburban Transportation Company had in those other segments prior to the 1968 condemnation. Relatedly, DOT also contests the trial court's ruling which barred cross-examination of Dolman concerning the Company's interest in those other segments, and which barred DOT from attempting to prove that the Company's previous legal interest in those other segments of the track roadbed had expired prior to the condemnation.

In connection with the foregoing challenges, the appellant argues, in sum, that the trial court erroneously excused BMC from a crucial element of its burden of proof in this case: the burden of showing that the Philadelphia Suburban Transportation Company, at the time of condemnation, had a compensable interest in *all* of the land as to which evidence of damages was admitted at trial.

The appellant's next assignments of error concern the testimony of John Curtin, BMC's first valuation witness. DOT argues that Curtin's background did not qualify him to be an expert valuation witness in

522

this case, and that the trial court erred in accepting him as such. As a further matter, DOT asserts that the court erred in permitting him to give an opinion, regarding market value, based on his estimate of the functional replacement cost of the condemned section of track roadbed. DOT additionally complains that the trial court allowed Curtin to present an improperly wide range of figures; and that his testimony contained no appraisal of the "before-and-after" values of the condemned property. Lastly, DOT urges that the court erred in refusing to instruct the jury to disregard the testimony about replacement cost.

The errors assigned by DOT in this appeal were all raised below in the motion for a new trial.

We first will consider DOT's various arguments concerning the issue of ownership. As noted, the trial court ruled that DOT and its predecessor had waived the right to dispute that the Philadelphia Suburban Transportation Company, at the time of condemnation, still owned easements in part of the land taken. The court so ruled because: (1) the Declaration of Taking incorporated a schedule of condemnees which recited that the Company owned such easements; (2) the condemnor never undertook to amend that recital; and (3) the condemnor failed to preliminarily object when the Company, in its petition for viewers, averred ownership of the easements in question. Regarding those easements, we conclude that the trial court's ruling was correct. Our conclusion, however, rests on a basis somewhat different from those advanced by the court below.

In decisions antedating the Eminent Domain Code, the Supreme Court of Pennsylvania held that if a condemnor has objections to the title asserted by a claimant in a petition for viewers, such objections could be raised when the petition is filed. *Ehret v. Schuylkill River E.S.R.R.*, 151 Pa. 158, 24 A. 1068 (1892);

*Church v. Northern Cent. Ry.,* 45 Pa. 339 (1863). We see nothing in the Code to nullify that rule. Indeed, the 1969 amendment to Section 504 of the Code[5] provides that: "[a]*ny objection* to the appointment of viewers not theretofore waived *may* be raised by preliminary objections filed within twenty days after receipt of notice of the appointment of viewers." (Emphasis added.)

Based on the foregoing considerations, we conclude, with regard to the instant case, that preliminary objections under Section 504 of the Code could have been used by the condemnor to raise a legal challenge or objection to the condemnee's claimed ownership of the easements set forth in the petition for viewers, which was filed on April 23, 1970. DOT's contention that those easements expired prior to the 1968 condemnation, because the trolley tracks had been removed, depends, as a threshold matter, on the construction and legal operation of the ancient deeds that created the easements. Had the condemnor raised its challenge by timely preliminary objections to the petition for viewers, the court could have directed the viewers to address the issue of the condemnee's ownership of the easements. *Powell Appeal,* 385 Pa. 467, 123 A.2d 650 (1956). Given the facts of the case at bar, the condemnor could not even begin to pretend that it was not aware of the deeds, and the removal of the trolley tracks, at the time the Philadelphia Suburban Transporation Company petitioned for viewers in 1970.

Assuming, for the sake of argument, that preliminary objections were not the *sole* procedural means of raising a challenge to the easements in question, we cannot ignore the terms of Section 516(a)(2) of the

---

[5] 26 P.S. §1-504. The 1969 amendment was made by Section 1 of the Act of December 5, 1969, P.L. 316.

Code.[6] Section 516(a)(2) mandates that an appeal
from a viewers' decision shall set forth "a brief de-
cription or identification of the property involved and
*the condemnee's interest therein."* (Emphasis
added.) When DOT appealed to the Court of Common
Pleas from the viewers' decision, its appeal pleading
set forth that the condemnee owned part of the con-
demned land "in fee simple," and that the rest was
*"held by way of easement."* (Emphasis added.) Gen-
erally, litigants are not required to plead conclusions
of law. However, Section 516(a)(2) of the Code does
impose such a requirement in at least one important
respect: When a viewers' decision is appealed to a
Court of Common Pleas, the appeal pleading must de-
scribe or identify the condemnee's property interest
in the land in question. Consequently, when the ap-
peal pleading sets forth a particular description of
that interest, the statement cannot be treated as hav-
ing no legal effect. We conclude that the description
pleaded serves to frame or to negate, in advance of
trial, an important issue of the case. If DOT wished
to controvert the claim of the Philadelphia Suburban
Transportation Company regarding easements in the
land taken, DOT should not have recited, in its appeal
pleading to the Court of Common Pleas, that the con-
demnee's interest in the condemned strip included
such easements. Although the viewers' report failed
to name the recipient of the award or even to desig-
nate the particular property for which the award was
made, we cannot see how those deficiencies in the re-
port would have compelled DOT to plead the existence
of an easement interest had DOT wished to controvert
the condemnee's claim in that respect.

It should be remembered that this case began in
1968, with a Declaration of Taking which recited that

[6] 26 P.S. §1-516(a)(2).

the Company had a fee simple in a specified part of the condemned land and easements in the designated remaining portion. Although we refrain from decid-- ing whether or not such a recital *in a Declaration of Taking* is binding, we must conclude that the recital had at least one effect: it created the appearance that the condemnor recognized the existence of the easement interests.[7] That impression was hardly diminished when, in 1970, nearly 2 years after the filing of the Declaration, the condemnor raised no objection to the condemnee's petition for viewers, which expressly included those easements in the claim for damages. More than 9 years after that, in DOT's 1979 appeal to the Court of Common Pleas, the statement was again made that the condemnee's interest in the condemned land included the easements in question. DOT never sought to amend that pleading.

It was not until February of 1980, more than 11 years after the commencement of this litigation, that DOT filed any type of pleading which sought to question the Company's ownership of the easements. That effort, as noted, was in the form of a petition to the trial court for a preliminary determination of the Company's title and interest in the condemned strip of land. We conclude, even at the time that application was filed, DOT had waited too long to raise the issue. Given the nature of DOT's challenge to the Company's claimed ownership of the easements, we can ascertain no excuse for the failure to raise the issue at a time when preliminary objections could have been filed in response to the petition for viewers, or to raise it at the time the appeal was taken to the Court of Common Pleas. Since DOT not only failed to preliminarily object to the Company's claimed own-

---

[7] It should be noted that Section 402 of the Code, 26 P.S. §1-402, in prescribing the contents of a Declaration of Taking, does not require a description of a condemnee's title or interest.

ership of the easements in question, but also filed an appeal pleading which expressly recognized such ownership, we hold that, under the circumstances of this case, DOT waived the issue.

Our conclusion regarding the easements does not dispose of all the ownership issues in this case. There remains the question of whether the trial court erroneously excused BMC from having to prove a compensable title or interest in the *uncondemned* segments of the former trolley route. The significance of this question lies partly in the fact that the trial court permitted BMC, through the testimony of witness Dolman, to present evidence of severance damages relative to the uncondemned segments of the route. As an additional matter, it seems that witness Curtin, in appraising the strip condemned, assumed that the roadbed of the entire former trolley route, between 69th Street Terminal and Ardmore, had still belonged to the Philadelphia Suburban Transportation Company at the time of the condemnation here involved. In other words, Curtin's valuation of the strip condemned was influenced by an assumption that the strip, at the time of taking, was part of a 5-mile corridor of land throughout which the Company still had a legal right of use.

We will assume that, during the several decades the Company and its predecessors operated a trolley service between 69th Street Terminal and Ardmore, they had some estate, title or interest in the track roadbed. However, as to the uncondemned segments of that route, the record in the instant case gives no indication of what that interest was. BMC introduced no evidence, by documents or otherwise, to reveal the nature of the Company's interest in those segments. And DOT, at trial, was barred from attempting to show that those interests were such that they had expired prior to the 1968 condemnation.

Since we do not know what legal interest the Company had in the uncondemned segments, we must recognize a distinct possibility: that the segment of uncondemned roadbed in the middle of West Chester Pike, and the segment of uncondemned roadbed which adjoins the northwesterly end of the strip taken, were held pursuant to estates or titles which, as a matter of law, expired upon the termination of the trolley service. *See, e.g., Chew v. Commonwealth,* 400 Pa. 307, 161 A.2d 621 (1960).

Regarding the segments of roadbed which are outside of the strip condemned, we cannot conclude that there was a waiver of the ownership issue. The petition for viewers did not include a word about the uncondemned segments;[8] the viewers' report did not state that damages had been awarded for them; and DOT never pleaded any statement concerning those segments. Consequently, it was error for the trial court to rule, in effect, that the ownership issue as to the uncondemned segments had been waived.

As observed, the relationship between the condemned strip and the remaining portions of track roadbed was an important element in the valuations by BMC's two witnesses. Therefore, proof that the condemnee, at the time of the 1968 condemnation, still had a legal right to use those other portions was a necessary predicate to the valuation of the part taken. Since there was no such proof adduced by BMC, the judgment in this case cannot stand. Having so concluded, we need not consider the appellant's remaining arguments.

---

[8] Section 502(a)(5) of the Code, 26 P.S. §1-502(a)(5), requires that a petition for viewers contain a brief description of the condemnee's property; and provides that the description may include *"any or all of his properties* in the same county *taken, injured or destroyed* for the same purpose by the condemnor. . . ."* (Emphasis added.)

For the reasons set forth in this opinion, the judgment entered by the court below must be reversed, and a new trial granted.

ORDER

AND Now, the 12th day of January, 1984, the judgment of the Court of Common Pleas of Delaware County, at No. 68-12626, is reversed; and the appellant is hereby granted a new trial.